Filed 2/19/14  In re James P. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re JAMES P., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUAN E.,<br><br>    Defendant and Appellant. | F066441<br><br>(Super. Ct. No. 515877)<br><br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the nonpublished opinion filed herein on January 24, 2014, be modified as follows:

On page 11, line one of the sixth paragraph, replace the name "Haley" with "Hailey."

On page 15 starting with the paragraph beginning "But we need not resolve" and continuing through to the last paragraph on page 18 ending with "discretion in

terminating services when it did" are deleted. The following paragraph is inserted in its place:

> But we need not resolve the complex and possibly conflicting rules enunciated in sections 361.2 and 361.5 and the interpretation of those rules in *A.C.* or *T.W.* because, even if the reunification period should have been extended by four months, as argued by father, he has failed to show how he was prejudiced by the termination of services. Father received a total of more than 26 months of combined family maintenance and reunification services and failed to make any significant progress. Although father bears the burden of showing prejudice, he offers nothing to rebut the juvenile court's conclusion that the likelihood of reunification in the remaining four months was extremely low. Any error on the part of the juvenile court was therefore harmless.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____
Franson, J.

WE CONCUR:

_____
Cornell, Acting P.J.

_____
Poochigian, J.

2.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re JAMES P., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JUAN E., <br><br> Defendant and Appellant. | F066441 <br><br> (Super. Ct. No. 515877) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County. Ann Q. Ameral, Judge.

Hassan Gorguinpour, under appointment by the Court of Appeal, for Defendant and Appellant.

John P. Doering, County Counsel, Carrie M. Stephens and Robin Gozzo, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Juan E. is the father of six-year-old James P. who was removed from his care. Father contends that the juvenile court incorrectly determined the date of James's removal for purposes of calculating the length of reunification services. He further contends that the services were not reasonable. We disagree and affirm.

### SUMMARY OF FACTS AND PROCEDURES

*Background Facts*

This is the third appeal in this case. The first two appeals were brought by James's mother, Tiffany P., who had had sole legal and physical custody of James. James, then age two, and half sister Hailey, then age one,[1] were removed from mother following a September 2010 Welfare and Institutions Code section 300 petition[2] alleging that mother locked the children in a bedroom for hours. Father was not named in the petition. James was placed in the temporary custody of father, who up until this point was only casually involved with James.

The report prepared in anticipation of mother's jurisdiction/disposition hearing recommended that James remain with father, and that father receive family maintenance services in the form of parenting education and a clinical assessment to determine the extent of father's self-reported emotional or educational issues.

*James Placed with Father in January 2011 with Family Maintenance Services*

Following mother's contested hearing in December 2010 and January 2011, the juvenile court found that return of the children to mother's custody posed a substantial risk of harm. James was placed with his father, under court supervision with family maintenance services. A clinical evaluation was ordered for father.

---

[1]     Hailey and subsequently born children Daniel and Aubrey all have different fathers. Only James is the subject of this appeal, but at times we refer to the other children when relevant to this appeal, either by name or collectively as the children.

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

Mother appealed. While the appeal was pending, a status review report in May of 2011 stated that James was living with father and his girlfriend. Father was working on his maintenance plan. He had completed two of three parent-child labs and was progressing. It was recommended that James remain in father's care under court supervision, with the added requirement that father undergo a psychological evaluation.

*Supplemental Petition filed Against Father*

While mother's appeal was pending, a section 387 supplemental petition was filed against father, stating that father had allowed mother to move into his home with James, contrary to the court order that all contact between James and mother be supervised by the social services agency. As a result, James was placed in protective custody on August 30, 2011.

In a subsequent interview concerning the incident, father became very emotional, yelling that he did not want to live in the apartment without James. According to father, he needed someone to help him "not give up." Father said he might hurt himself if James was taken from him, but denied having suicidal thoughts. Although he stated he never left James alone with mother, he admitted she was on her way to pick him up from school. He also stated he needed the welfare money James provided in order to afford his apartment. The September 20, 2011, jurisdiction/disposition report recommended that James remain in protective care and that father be granted reunification services.

The combined contested review hearing on mother's original petition and father's section 387 supplemental petition was heard over a number of dates. Prior to the scheduled hearing, in November 2011 this court, in response to mother's first appeal, affirmed the January 2011 order of jurisdiction but reversed the disposition orders, finding there was insufficient evidence to demonstrate a substantial risk of harm to the children at the time of the hearing which could not be mitigated by family maintenance services and close supervision by child welfare staff. James and Haley were ordered to be returned to mother.

The January 2012 report prepared for disposition on the remittitur for mother's case recommended the children remain dependents of the court. It further recommended James and Haley be released to mother's custody with family maintenance services and that father receive reunification services for James.

According to the report, father was now living with his father after he broke up with his girlfriend and lost his apartment. He stated he was struggling with mental health issues and a diagnosis of Asperger's syndrome. Since he had difficulty caring for himself, his father was taking care of him. Although he had completed a psychological evaluation for social security disability, he did not have the results of the evaluation. He was denied disability and was now appealing.

In December of 2011, father had a breakdown and checked himself into a health center and was prescribed medication for depression and anxiety. Because he would soon no longer be eligible for his father's insurance, he was advised to apply for indigent aid, but he claimed he could not complete the application process due to transportation issues. Father recognized that he was unable to care for himself and therefore could not care for James. Because he missed an appointment, father had not yet completed a psychological evaluation, but was in the process of being referred. The social worker noted that father's mental health had deteriorated since James was placed in his care. Father attributed this to Asperger's, which he had researched on the internet and which he claimed was confirmed during the disability evaluation. According to father, his bad judgment was attributable to this disorder. The recommended psychological evaluation was to determine if there were other services that would be needed to assist father in reunifying with James.

James continued to receive services through Valley Mountain Regional Center (VMRC) and was reported by his care providers to be improving in both speech and social skills.

*Section 342 Subsequent Petition Filed Against Father*

Prior to the hearing on the remittitur, it was determined that the social services agency would file a section 342 subsequent petition regarding James, with the January 2012 disposition report serving as the jurisdiction/disposition report for the section 342 petition. The January 18, 2012, petition alleged under section 300, subdivision (b) that father was unable to care for James due to his mental health issues as well as his failure to protect James from mother, citing the court order that she only have contact at the social services agency offices during supervised visitation.

At the combined disposition and remittitur hearing held January 19, 2012, father waived his right to a hearing and submitted on the petition and reports. The juvenile court, noting that James had previously been removed from father, found the petition true and that return of James to father would create a substantial risk of harm. Father had made only limited progress on alleviating the issues necessitating placement.

*Father Granted Six Months of Reunification Services*

Father was granted reunification services. Following discussion, it was determined there was a six-month limitation on services because James was placed with his siblings, who were under the age of three. Father was admonished that, if he did not make progress in six months, services could be terminated.

On the remittitur, James and Hailey were returned to mother's full-time custody with family maintenance services. Daniel, who had been placed with his father (John), remained in his father's primary care.

*Supplemental Petition Against Mother*

Only one month later, in February of 2012, the social services agency filed another section 387 supplemental petition seeking removal of James and Hailey from mother's home.

The jurisdiction/disposition report on the supplemental petition recommended that James be removed from mother's custody and she be granted reunification services. It

5.

also recommended that reunification services continue for father. The report noted that father had been instructed to continue with his previously issued case plan. He had completed the psychological evaluation, which was attached to the report. The evaluation was conducted in early February 2012.

*Psychological Evaluation of Father*

The doctor who evaluated father noted that, although father described himself as depressed, his social interactions were suggestive of adult attention deficit hyperactivity disorder (ADHD). He was quite talkative, but had limited insight and direction in his life. Father had a limited work history, stating that the longest time he had held a job was for one month. He reported being physically abused by his father as a teenager. He described himself as lacking motivation to do much of anything with his life.

The report also noted father's belief that he had Asperger's, which he based on his social security disability evaluation and his self-described unique or "creative" way of thinking, which he claimed was one of Asperger's diagnostic criteria. But the report also noted father had stated that the diagnosis led to his decompensation and hospitalization the previous December. The doctor was unsure of whether it was an actual diagnosis. Again, while father described himself as depressed, the doctor noted that father's affect during the evaluation and a present sense of humor argued against clinical depression.

The doctor noted that, while father had some of the common symptoms of Asperger's, he lacked others. The doctor did not specifically test for this disorder in the evaluation. The doctor did administer the Minnesota Multiphasic Personality Inventory-2, the Millon Clinical Multiaxial Inventory-2 and Interpersonal Behavioral Survey to father. The doctor's clinical diagnosis for father was dysthymia and ADHD on Axis I, and personality disorder NOS with avoidant and schizoid features on Axis II. Testing found father to have dependent traits, which led him to rely on relationships to take care of his basic needs. The doctor attributed father's difficulties to being raised in an unhealthy family and suffering physical and emotional abuse.

6.

The doctor recommended ongoing parenting training for father and noted his avoidant tendencies would make it difficult for him to parent particularly James, because James's autism would make parenting difficult and frustrating. This would trigger father's avoidant behaviors, likely resulting in neglect. Father had a high probability of turning over responsibilities for James to someone like a girlfriend. The doctor recommended that father maintain his medication regime and be evaluated for ADHD. He recommended further parenting education and individual counseling be provided by a single provider, preferably Sierra Vista, where father was already involved. He recommended a hair follicle test to rule out any possible illegal drug use. He did not recommend any further testing for Asperger's syndrome.

*Hearing on Mother's Second Supplemental Petition*

The contested hearing on mother's second section 387 petition continued over six days, beginning on April 17, 2012, and concluding May 11, 2012. Father did not provide any evidence and appeared at only two of the six hearing days. The juvenile court ordered a new disposition, leaving Hailey in mother's care with continued family maintenance services. James was removed from mother and father's custody and continued in foster care with reunification services. The juvenile court found father's progress limited. It made changes to the proposed plan regarding mother, but no changes were requested or made to the case plan for father.

Mother's second appeal challenged this order, which this court subsequently affirmed. (*In re James P.* (Sept. 11, 2013, F065284) [nonpub. opn.].)

*Follow-up Reports on Father*

An interim review report prepared for the August 15, 2012, progress review hearing stated that father had been visiting and generally had good visits, except on the occasions when he was observed to be playing on his telephone or listening on earphones rather than interacting with James. While father expressed a desire for increased visits, he made no effort to make these visits happen. The report recommended that

7.

reunification services for father continue. The report noted that, as of the end of May of 2012, father was back with his previous girlfriend, who accompanied him to the visit. They reported that they planned to get married. In June of 2012, father reported that his depression and anxiety stemmed from his Asperger's syndrome, but that the medications he was taking helped. He was planning on moving out of his parent's home and in with his girlfriend.

Father did not appear at the August 16, 2012, interim review hearing. The juvenile court granted discretion to the social services agency to begin day-long and overnight visits with mother for James.

The status review report prepared in anticipation of the November 7, 2012, six-month review hearing stated that James remained in foster care. James was making significant progress in social skills and communication.

The report stated father continued to engage in counseling at Sierra Vista, but that the counselor reported father had not progressed as he still claimed he was unable to work, cook or clean for himself. The counselor questioned father's ability to care for James's basic needs with his limitations in caring for himself. Father was still taking medication for depression and anxiety. He had contacted VMRC and was informed that he would not qualify for services with a diagnosis of Asperger's syndrome, but he did not pursue it further. When the social worker attempted to determine where father reportedly received the diagnosis of Asperger's, father could not name the mental health center nor the doctor he had seen. The social worker's attempts to find some record of the diagnosis proved futile.

Father continued to live with his parents, but was no longer in a relationship with his girlfriend. He had not been able to establish another residence. According to father, the "hold up" was in getting a job and a place to live so he could show that he could do things on his own. He wanted more time to "prove himself."

The social worker noted that, although father had "basically" completed his case plan, he had made little progress in demonstrating that he could care for his son alone because he was not able to care for himself. He frequently forgot appointments and failed to follow through on things he started. On August 20, 2012, the social worker asked him when his next court appearance was. He said he had gotten a paper in the mail, but he did not know the date. It had been August 15, 2012, and he failed to appear.

In a discussion in September of 2012, between the social worker, father, and father's father, father's father stated that he thought James would be cared for by father until father's girlfriend left him. Father became visibly angry and agitated and told his father "not to ever, ever say her name to him again."

The report recommended that reunification services for mother continue but that they be terminated for father. It also recommended that James begin a trial visit with mother.

At the November 7, 2012, six-month and section 364 review hearing, the social services agency was given discretion to start a trial visit for James with mother. Father's counsel requested a contested hearing on the recommendation to terminate reunification services and raised "procedural issues." The juvenile court set the matter for pretrial hearing on November 15, 2012, to address the procedural issues and for contested hearing in December 2012.

On November 15, 2012, both parties' counsel were directed to file points and authorities on the disputed issue of how the length of reunification services should be handled under the somewhat convoluted events of the case.

*Hearing and Order on Reunification and Reasonableness of Services*

At the December 12, 2012, section 366.21 review hearing, father's counsel argued that father had received only six months of reunification services under her reading of the code. She also argued that reasonable services had not been offered and requested that services specific to Asperger's syndrome be offered father. Counsel for the social

9.

services agency countered that there was no actual evidence other than father's own statement of an Asperger's syndrome diagnosis.

After argument, the juvenile court reasoned that "James has been detained from his father's care at least, if not sooner, but at least since August 30th, 2011, and therefore, date of entry into foster care would be October 29th, 2011." The juvenile court then found, based on these dates, that father had already had 12 months of reunifications services. The juvenile court also found that there was no evidence that father had been diagnosed with any sort of autistic disorder. It found that father had been unable to care for himself and "if he can't care for himself after 12 months of services, I don't know how he could possibly care for the needs of James. And James's needs are more difficult than some .…" The juvenile court found that reasonable services were offered father and terminated his services.

## DISCUSSION

### I. LENGTH OF REUNIFICATION SERVICES

Father contends that the trial court erred when it determined that his reunification services had expired. Respondent disagrees. We find no error in the juvenile court's termination of father's reunification services.

As aptly put by respondent, this case involves "twists and turns [that] are both factual and procedural, including original, supplemental and subsequent petitions, placement with a non-custodial parent, an appellate reversal, extended contested hearings, the addition of siblings to the family during the course of the case and siblings sometimes being placed together and other times being placed apart. The issue, however, is whether despite these many twists and turns, [father] received 12 months of reunification services under [section] 361.5."

*Procedural Summary*

To fully understand father's argument, we summarize, as best we can, the procedural history of this case:

9-9-10: The children were removed from mother's care (§§ 300, 325, 332) and James was placed in the temporary custody of father (§ 319).

1-11-11: Following a contested hearing, James was placed with father under court supervision with family maintenance services (§ 361.2).

8-30-11: James was removed from father's care and placed in protective custody after father allowed contact with mother against court order (§ 361, subd. (c)).

9-1-11: A supplemental petition was filed against father (§ 387).

1-18-12: After remittitur was received from this court, a subsequent petition was filed against father in response to father's inability to care for James (§ 342).

1-19-12: On remittitur from this court, James and Haley were returned to mother, who was provided maintenance services. The supplemental petition against father was found true and father was granted six months reunification services (§§ 342; 361.5, subd. (a)).

2-23-12: A supplemental petition was filed against mother to remove James and Haley from mother's home based on new allegations (§ 387).

5-11-12: After several days of hearings on the supplemental petition against mother, James was removed from mother and father's custody. Reunification services were continued for both mother and father.

8-15-12: A review hearing report recommended continued reunification services for father.

11-7-12: A review hearing report recommended termination of reunification services for father.

12-12-12: A review hearing was held and reunification services for father were terminated. The court ruled that father had already had 12 months of services, beginning on October 29, 2011 (§ 361.49).

*Applicable Law and Analysis*

Section 361.5 generally requires the court to order the social services agency to provide reunification services to the parents. However, the services are limited under

11.

section 361.5 to 12 months, with a possible extension to 18 months. (§ 361.5.) Section 361.5, subdivision (a) provides, in pertinent part:

> "(1) Family reunification services, when provided, shall be provided as follows:

> "(A) … for a child who, on the date of initial removal from the physical custody of his or her parent or guardian, was three years of age or older, court-ordered services shall be provided beginning with the dispositional hearing and ending 12 months after the date the child entered foster care as provided in section 361.49, *unless the child is returned to the home of the parent or guardian.*" (Italics added.)

A child is "deemed to have entered foster care on the earlier of the date of the jurisdictional hearing … or the date that is 60 days after the date on which the child was initially removed from the physical custody of his or her parent .…" (§ 361.49.)

At the December 12, 2012, review hearing, the juvenile court terminated father's reunification services, determining that the date at which point reunification services began for father was October 29, 2011, 60 days after James was removed from father's custody on August 30, 2011. Father argues that the date at which point reunification services began for him was April 21, 2012, 60 days after James was removed from both mother and father's custody in February of 2012, and should expire on April 21, 2013. As argued by father, the italicized language above suggests that the requirement for reunifications services established under section 361.5 and the corresponding time limits on those services do not apply when the child is returned to the home of at least one parent at the disposition hearing, but only at a disposition hearing when the court finds that neither parent can safely assume custody of the child.

The issue of whether the services provided father fell short of the statutory requirements is a question of statutory interpretation. As such, we apply a de novo standard of review. (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 849 [issues of law and statutory construction are reviewed de novo]; *In re Alanna A.* (2005)

12.

135 Cal.App.4th 555, 562 [where facts are not disputed, the effect or legal significance of those facts is a question of law to be reviewed de novo].)

Father relies on two cases, *In re A.C.* (2008) 169 Cal.App.4th 636 (*A.C.*) and *In re T.W.* (2013) 214 Cal.App.4th 1154 (*T.W.*), for the proposition that his right to reunification services did not commence until James was removed from mother's custody as well, and thus, any reunification services he received up to James's removal from mother should not be considered in calculating the 12-month period for reunification services. Both cases cited by father involve similarly complicated factual situations akin to those here. In both, the child (*T.W.*) and children (*A.C.*) were removed from one parent, placed with the other, and then removed from that parent and either placed with the original parent and then custody (*T.W.*) or placed directly into out of home custody (*A.C.*). The issue in each was when the timeline for reunification services began.

In *A.C.,* the appellate court affirmed the juvenile court's ruling, finding that "the time limits for services set forth in section 361.5 do not apply if dependents are not removed from the custody of both parents at the dispositional hearing. [Citations.]" (*A.C., supra,* 169 Cal.App.4th at p. 649.) The court explained that the "section 361.5, subdivision (a) 'clock' does not start to run against such parents unless and until the children are removed from the physical custody of the parent(s) and the court determines whether the parent(s) (are) entitled to reunification services pursuant to the lengthy analysis set forth in section 361.5." (*Id.* at p. 650, fn. omitted.)

In its analysis of the issue, the court in *T.W.* looked at the interplay between sections 361.2 and 361.5, which were enacted as parts of a single legislative scheme and agreed with the court in *A.C.* (*T.W., supra,* 214 Cal.App.4th at p. 1165; see also *In re Erika W.* (1994) 28 Cal.App.4th 470, 475.) It noted that the goal of section 361.5 is to promote the return of the child to parental custody. With this goal in mind, the statute contains general rules for providing family reunification services to parents of minor children removed from parental custody and, that under the statute, reunification services

13.

are mandatory except in certain specified circumstances. (*T.W., supra,* at p. 1165, citing § 361.5, subds. (a) & (b)(1)-(15).)

The court determined that, under the plain language of section 361.5, subdivision (a)(1)(A), the period for mandatory reunification services begins at the time of disposition and continues while the child is in foster care or until the child is returned to the home of the parent. "The statute does not apply if, at the disposition hearing, a child does not enter foster care, but is placed with a parent. [Citation.]" (*T.W., supra,* 214 Cal.App.4th at p. 1165.) Thus, the "clock" for services under section 361.5, subdivision (a), does not start to run "unless and until the child is removed from the physical custody of the parents and the court determines whether they are entitled to reunification services according to the lengthy analysis set forth in that statute. [Citations.]" (*T.W., supra,* at p. 1165.)

Section 361.2 also pertains to the provision of reunification services, but unlike section 361.5, applies only when the minor is removed from the physical custody of one parent under section 361 and placed in the custody of the noncustodial parent under supervision of the juvenile court. (§ 361.2, subds. (a) & (b); *In re Erika W., supra,* 28 Cal.App.4th at p. 475.) Reunification services under section 361.2 are discretionary and not expressly time-limited because the minor remains in the custody of a parent and the goal of placing a child in parental custody has been met. (*In re Erika W., supra,* at p. 478.) As stated by the court in *T.W., supra,* 214 Cal.App.4th at page 1167, "A comparison of sections 361.5 and 361.2 suggests there are two separate statutory tracks for services: one when a child is placed with a noncustodial parent (§ 361.2), and another when a child is placed with someone other than a parent (§ 361.5). [Citation.]"

Due to the various conflicting court orders before us, the various plausible time frames for when reunification services began is either October 29, 2011, as determined by the juvenile court, which is 60 days after James was first placed in out of home custody; January 19, 2012, when father was granted reunification services after the section 342 subsequent petition was found true; April 21, 2012, which is 60 days after

14.

James was removed from mother's custody after the second section 387 petition was filed; or May 11, 2012, at the hearing on the section 387 petition when the juvenile court removed James from both mother and father's custody and continued reunification services for both.

But we need not resolve the complex and possibly conflicting rules enunciated in sections 361.2 and 361.5 and the interpretation of those rules in *A.C.* or *T.W.* because, even if the reunification period began on the latest of these dates, May 11, 2012, and continued for only seven months, until terminated on December 12, 2012, any potential error in this respect was harmless. As we discuss further, below, father received reasonable services but failed to make any progress in his case plan. Therefore, substantial evidence independently supports termination of services for him.

As noted earlier, the statutory language set forth in section 361.5, subdivision (a) "establishes a dual-track approach based on the dependent minor's age. If the child is under three, the default position is six months of reunification services. If the child is over three, the default position is 12 months. For both categories, the outer limit is 18 months. But none of these time periods is immutable." (*In re Derrick S.* (2007) 156 Cal.App.4th 436, 444-445 (*Derrick S.*).) Here, inasmuch as James was four years old in April of 2012, the default period for reunification services was 12 months. However, as noted by the court in *Derrick S.*, "there is no absolute right to receive the maximum amount of statutorily fixed services in any and all circumstances." (*Id.* at p. 445.) This follows the principle stated in *In re Aryanna C.* (2005) 132 Cal.App.4th 1234 (*Aryanna C.*) that "reunification services constitute a benefit; there is no constitutional "'entitlement'" to those services." (*Id.* at p. 1242; *Derrick S.*, *supra,* at p. 445.) Thus, for dependent children over the age of three "'[n]owhere is it provided that a *minimum* of 12 months of services is required….'" (*Derrick S., supra,* at p. 445, italics in original.)

The statutory language set forth in section 366.21, subdivision (e) fortifies this conclusion, which provides, in part, as follows:

> "At the review hearing held six months after the initial dispositional hearing, … the court shall order the return of the child to the physical custody of his or her parent … unless the court finds … that the return of the child … would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.… The failure of the parent … to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental. In making its determination, the court shall … consider the efforts or progress, or both, demonstrated by the parent … and the extent to which he or she availed himself or herself to services provided…."

After addressing various situations that are not applicable to the instant case, subdivision (e) goes on to state:

> "In all other cases, the court shall direct that any reunification services previously ordered shall continue to be offered to the parent … pursuant to the time period set forth in subdivision (a) of Section 361.5, provided that the court may modify the terms and conditions of those services. [¶] If the child is not returned to his or her parent …, the court shall determine whether reasonable services that were designed to aid the parent … have been provided or offered to the parent …. The court shall order that those services be initiated, continued, or *terminated.*" (Italics added.)

In *Aryanna C., supra,* 132 Cal.App.4th 1234, the court was faced with the issue of whether the juvenile court had acted appropriately when it terminated services for the parent of a child under the age of three, even before the conclusion of the initial six-month reunification period. In support of its conclusion that the juvenile court had acted appropriately, the appellate court explained such a termination was not only consistent with the language of the applicable statutes, but also "with the purposes underlying the dependency system. Where, as the record shows in this case, the likelihood of reunification is extremely low [citation], a continuation of the reunification period would waste scarce resources and delay permanency for dependent minors." (*Id.* at p. 1242.) The court noted that its "interpretation of the pertinent statutes is consistent with the legislative intent behind the statutory scheme - 'to balance efforts to reunify the family with the child's need for stability.'" (*Ibid.*) Moreover, the court emphasized that

16.

"reunification services constitute a benefit; there is no constitutional '"entitlement"' to those services. [Citation.] [¶] … [Thus it] remains within the discretion of the juvenile court to determine whether continued services are in the best interests of the minor, or whether those services should be ended at some point before six months have elapsed." (*Id.* at pp. 1242-1243, fn. omitted.)

In *Derrick S., supra,* 156 Cal.App.4th 436, the court applied the reasoning of *Aryanna C., supra,* 132 Cal.App.4th 1234 to a case involving the termination of services for the parent of a child who was over the age of three. There, the court addressed the issue of whether it was ever appropriate to terminate services short of the 12-month point in a case of an older child. Based upon the reasoning of *Aryanna C.*, the court concluded it was: "No statute or rule of court restricts a juvenile court's discretion to order less than the maximum amount of reunification services when confronted with a parent who is unwilling or unable to benefit from additional reunification services, or if for other reasons the likelihood of reunifying the family is faint." (*Derrick S., supra,* at p. 439.)

Here, the juvenile court granted the social services agency's request to terminate services, finding, in part, that father's mental health had deteriorated "over the course of this case" and that, while father may have at one point had the capacity to care for James, "that capacity has been compromised." The juvenile court noted father's psychological exam and the various reports in his file, which indicated father had a tendency to avoid difficult issues and had an inability to care for himself even after all of the maintenance and reunification services offered him, making it especially difficult for him to meet the special needs of James.

The report prepared in anticipation of the December 2012 hearing supports the juvenile court's determination. At the time, father continued to live with his parents in their home. While father continued to attend counseling, he had made "no further progress," as he was still unable to live independent of his parents and still claimed he was unable to work, cook or clean for himself. The counselor questioned father's ability

17.

to care for even James's basic needs. And while father had completed the parenting program, the counselor was unable to determine that father understood what he had learned. Father had attended two-hour weekly visits with James, although at times he played with his phone or insisted on wearing earphones, and therefore was not engaging with James. The social worker reported that father had "basically completed his case plan but has made little progress in being able to demonstrate that he can care for his son alone because he is unable to care for himself." Father often forgot appointments, including court dates. And while father made no progress in getting a place of his own so that he could have James visit, he also did not want James to visit at father's parents' home because he did not want his father around James.

We recognize that the exercise of discretion to terminate services short of 12 months will be "very infrequent." (*Derrick S., supra,* 156 Cal.App.4th at p. 450.) "Such a decision will be warranted only in those situations where the parent has already received or been offered reunification services, thus giving the juvenile court a basis for evaluating whether additional services will be utilized by the parent in the time remaining for reunification. Only from this historical perspective will the juvenile court be able to conclude … that 'the likelihood of reunification is extremely low.' [Citation.]" (*Ibid.*) Here, while the 12-month "clock" may not have begun to run until April of 2012, father received a total of more than 26 months of combined family maintenance and reunification services. The juvenile court had an adequate "historical perspective" from which to determine that the likelihood of reunification in the remaining four months was extremely low. (*Ibid.*)

We find the evidence was more than sufficient to support the juvenile court's conclusion that the likelihood of reunification was extremely low, even if father had been given an additional four months of reunification services as argued here. Under these circumstances, the juvenile court did not abuse its discretion in terminating services when it did.

## II. REASONABLENESS OF REUNIFICATION SERVICES

Father contends that the juvenile court erred when it found reasonable reunification services had been offered or provided. Specifically, father argues that his claims that he suffered from Asperger's were ignored. We disagree.

> "Family preservation is the priority when dependency proceedings commence. [Citation.] 'Reunification services implement "the law's strong preference for maintaining the family relationships if at all possible." [Citation.]' [Citation.] Therefore, reasonable reunification services must usually be offered to a parent. [Citation.] [The social services agency] must make ""'a good faith effort'"" to provide reasonable services responsive to the unique needs of each family. [Citation.] '[T]he plan must be specifically tailored to fit the circumstances of each family [citation], and must be designed to eliminate those conditions that led to the juvenile court's jurisdictional finding. [Citation.]' [Citation.] … The adequacy of [the social services agency's] efforts to provide suitable services is judged according to the circumstances of the particular case. [Citation.]" (*Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.)

"It is the job of [the social services agency] to assist parents with inadequate parenting skills in remedying the sources of the problem, not to eradicate the problem itself." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)

We realize, however, "[i]n almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) The applicable inquiry is whether the social services agency did all that is reasonably possible to do in order to help the parent accomplish the return of his or her child. (*In re Laura F.* (1983) 33 Cal.3d 826, 839.) However, if the parent believes they are not receiving reasonable services, they should call upon the court to help or seek the assistance of their attorney do so. (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.) A parent's emotional issues do not excuse them from

19.

a failure to participate. Some capacity to achieve reunification goals is presumed. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.)

We review the juvenile court's finding of reasonable services for substantial evidence. (*Angela S. v. Superior Court, supra,* 36 Cal.App.4th at p. 762.) Father's sole contention is that he was not provided reasonable services because the social services agency did not refer him for evaluation and services for his claimed diagnosis of Asperger's.

Father mentioned that he believed he had been diagnosed with Asperger's around the time that James was removed from his care, but such diagnosis was never confirmed. Father claims this diagnosis was made by a doctor during his social security disability evaluation. Because father had mental health issues, he was referred for counseling with Melissa Hale. Hale, in turn, referred father to Dr. Edward Moles for a psychological evaluation "to determine if there are any underlying mental health issues which may impact his ability to parent his child."

As part of Dr. Moles's report, he included medical records from father's mental health admission to a medical center in December of 2011.[3] Father was admitted on a "5150 for danger to self." While in the hospital, father mentioned that he had been diagnosed with Asperger's syndrome and that he had researched the diagnosis, which made him "severely depressed." The discharge diagnosis was for "Axis I: Depressive Disorder NOS [¶] Axis II: Deferred," but makes no mention of Asperger's.

Dr. Moles opined that father's behavior "suggested the presence of adult ADHD." Dr. Moles questioned whether father had an "actual diagnosis" for Asperger's because his medical records from his recent hospital stay indicated that his "decompensation" was due, in part, to father's belief that he had been so diagnosed. Dr. Moles stated that,

---

[3] The record lists this date as December of 2012, but it was obviously December of 2011.

while father exhibited some of the symptoms associated with Asperger's, he did not have others, and he made "no effort in this evaluation to verify this diagnosis." Dr. Moles's diagnosis was that father suffered from Axis I: dysthymia and ADHD, and Axis II: personality disorder NOS with avoidant and schizoid features.

Dr. Moles recommended continued parenting training for father and noted that father's avoidant tendencies would make it difficult for him to parent James, compounded by James's autism, which would make parenting even more difficult and frustrating. This, in turn, would trigger father's avoidant behaviors, likely resulting in neglect. According to Dr. Moles, father had a high probability of turning over responsibility of James to someone else, like a girlfriend. Dr. Moles recommended that father continue his medication and be evaluated for medication for ADHD, but did not recommend any further testing for Asperger's.

Dr. Moles's report was attached to the disposition report for the hearing which ultimately concluded on May 11, 2012. Father did not appear on May 10 or May 11, 2012, when arguments and a ruling were held regarding disposition. Father's counsel, who was present, stated, "[Father] has services, and he seems to be doing just fine, and I will leave the rest to the Court." No objection was made to Dr. Moles's evaluation and no request was ever made for additional testing or help on father's claimed diagnosis of Asperger's.

The social worker attempted to verify father's claim of having been diagnosed with Asperger's, but father could not tell her the name of the doctor who made the diagnosis, nor the name or location of the clinic. Further attempts to find this information proved futile.

It was not until the hearing on December 12, 2012, that father's counsel first mentioned father's request that he receive "services designed for a person with Asperger's …." Counsel for the social services agency stated that there was no evidence that father had been diagnosed with Asperger's, only his self-diagnosis. The juvenile

21.

court agreed, in making its ruling terminating services, that there was no evidence of an actual diagnosis.

Father argues further that, because he was participating but not progressing in his case plan, it was ipso facto inadequate. Not so. As noted by Dr. Moles, father had both dependent and avoidant aspects to his personality, which would make it difficult for him to parent a child, especially a difficult child like James. Melissa Hale reported that counseling with father was hampered by his avoidant personality traits, which made it difficult to delve deeper into issues. Father himself told the social worker that without his girlfriend, he could not take care of himself, and, when he and his girlfriend broke up, he then moved in with his father, whom he claimed abused him as a teenager.

"[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parent[] during the course of the service plan, and made *reasonable* efforts to assist the parent[] in areas where compliance proved difficult .…" (*In re Riva M., supra,* 235 Cal.App.3d at p. 414.)

Here, the social services department identified father's mental health issues. Melissa Hale and Dr. Moles both found father suffered from a serious personality disorder and that the severity of this personality disorder made it unlikely that he would benefit from services within the time allowed by law. Moreover, to the extent father's failure was one of his own choosing, reunification services are voluntary, and cannot be forced on an unwilling or indifferent parent. (*In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220.)

In light of the services offered father, his failure to win back James indicates his lack of interest or capacity, rather than inadequacy of services offered. (*In re Laura F., supra,* 33 Cal.3d at p. 839.) Under these circumstances, the juvenile court properly found that the social services agency had provided reasonable reunification services to father.

22.

## DISPOSITION

The orders are affirmed.

_____
Franson, J.

WE CONCUR:


_____
Cornell, Acting P.J.


_____
Poochigian, J.